# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

LYLE J. KLIMENT,

        Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

No. C09-4030-MWB

**REPORT AND RECOMMENDATION**

---

## I.  INTRODUCTION

The plaintiff Lyle J. Kliment seeks judicial review of a decision by an administrative law judge ("ALJ") denying his applications for disability insurance ("DI") benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.*, and Supplemental Security Income ("SSI") under Title XVI of the Act.  Kliment claims the ALJ erred in finding his impairment does not meet or equal Listing 12.05.C, in posing an improper hypothetical question to the Vocational Expert, and in determining that Kliment retains the residual functional capacity to work.  (Doc. No. 8)

## II.  PROCEDURAL AND FACTUAL BACKGROUND

### A.  Procedural Background

On April 28, 2005, Kliment protectively filed applications for DI and SSI benefits, alleging a disability onset date of July 1, 2002. (R. 16; 105-07; 311-13)  Kliment claims he is disabled due to an inability to read or write and a learning disability that prevents him from getting "any better jobs other than a dishwasher." (R. 147)  He claims he is unable to "run a cash register or computer or be a cook" due to his inability to read orders or handle money. (*Id.*)

Kliment's application was denied initially and on reconsideration. Kliment requested a hearing, and a hearing was held on May 9, 2008, before an Administrative Law Judge ("ALJ"). (R. 337-81) Kliment was represented at the hearing by non-attorney Richard Sturgeon. Kliment testified at the hearing, as did Vocational Expert ("VE") Michael McKeeman and Medical Expert ("ME") Thomas England. On May 29, 2008, the ALJ found that although Kliment is mildly mentally retarded, his impairment does not meet the Listing level of severity, and he has the mental residual functional capacity "for maximum sustained work activity." (R. 22) The ALJ therefore found that Kliment is not disabled. (R. 16-22) Kliment appealed the ALJ's ruling, and on March 16, 2009, the Appeals Council denied his request for review (R. 5-7), making the ALJ's decision the final decision of the Commissioner.

Kliment filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. (Doc. No. 3) In accordance with Administrative Order #1447, dated September 20, 1999, this matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended disposition of the case. Kliment filed a brief supporting his claim on June 16, 2009. (Doc. No. 8) The Commissioner filed a responsive brief on July 2, 2009 (Doc. No. 9), and Kliment filed a reply brief on July 12, 2009 (Doc. No. 10). The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Kliment's claim for benefits.


### B. Factual Background

### 1. Introductory facts and Kliment's hearing testimony
Kliment was born in 1964, and was forty-five years old at the time of the hearing.[1] He is 5'9" tall and weighs 120

---

[1]The ALJ's decision erroneously states Kliment was "currently 44 years of age." The hearing was held on Kliment's 45th birthday. In addition, in the ALJ's hypothetical question to the Vocational Expert, the ALJ erroneously identifies an individual "38 years of age." (R. 374)

pounds. He graduated from high school, receiving some of his instruction in special education classes. (*See* R. 307) He lives in a one-story house with his 79-year-old mother and his brother. (R. 350-51) His mother and brother pay all of the household expenses. (R. 352) His brother is hard of hearing and receives Supplemental Security Income benefits. (*Id.*)

Kliment's last job was at Mike's Saloon in Sioux City. He hand-washed dishes, mopped the floor, took out the garbage, and vacuumed the rug. (R. 345-46) He washed the walls once or twice, but he had no other duties on the job and no decision-making responsibilities. (R. 356-58, 363) When he started the job, he had never washed dishes by hand before, but his employer trained him for this job, including how much soap to add, how to dry the dishes, and where to put them. (R. 363) Kliment left the job at Mike's in July 2002, when his family moved out of town. (R. 351) When they returned to Sioux City, he did not return to working at Mike's because it was "too far to drive." (R. 347) He has a driver's license but does not like to drive. (*Id.*)

Kliment is able to read "little words" but not "big words." (*Id.*) He read the driver's license test without assistance. (*Id.*) He stated he cannot read a want ad in the paper, but he also stated he had "seen an ad in the paper" for the job at Mike's Saloon (R. 348), and he has seen other ads in the paper for dishwashing jobs (R. 358). Besides his reading problems, Kliment has difficulty writing. When he applied for the job at Mike's, his mother filled out the employment application for him. (R. 348) He is able to sign his name but has never written a check. (R. 353) His mother reads most things for him, including things like instructions on microwave meals. (R. 355) He does not believe he could comprehend any type of complex instructions well enough to follow them, even if someone showed him what to do. (R. 363)

On a typical day, Kliment will get up in the morning and watch television. In the afternoon, he will go out looking for cans to redeem. Collecting cans is his only source of income; he does not receive any type of public assistance or food stamps. He does not

know how to do laundry or cook, and he has never lived alone. (R. 348-49, 352-53) He does not know how to make a bed. His mother was incapacitated for a time from a broken wrist, and Kliment swept the floor and did the dishes at the residence but he did not cook or do laundry. He got food from "restaurants and stuff." (R. 349-50) He can do some minimal shopping by himself and is able to count out small change. (R. 358-59) He has ridden a bus on occasion, and he once got a telephone number from a telephone book without assistance. (R. 359) He sometimes goes to church with his mother and brother, but he does not belong to any other organizations. (R. 360) For recreation, he plays bingo and goes to the stock car races. He watches television, including the 10:00 p.m. news. (R. 360)

Kliment's representative asked him about his personal hygiene, noting Kliment's boss at Mike's Saloon had indicated he has body odor, his clothes are dirty, and his hair usually is messed up. Kliment indicated that is one reason he was not allowed to work around food at Mike's. (R. 361) Kliment and his mother used to go have coffee at Hy-Vee, but they were told they "can't go inside there anymore because of [their] body odor." (*Id.*) Kliment stated he does not like to take showers, and when he does take a shower, then he does not have clean clothes to put on. (R. 362)

In connection with Kliment's applications for benefits, the Social Security Administration sent him to see a doctor for an evaluation. According to Kliment, the doctor "had me do something with blocks and pictures and something else, and that stuff." (R. 354) His mother and brother took him to the evaluation. (*Id.*)

On April 15, 2004 (four years before the ALJ hearing), a Social Security representative talked with Kliment and his mother in connection with his application for benefits. The representative noted the following regarding Kliment's activities of daily living:

> The claimant states that he left his job in Sioux City to get land from his grandfather. He states he applied a few places for jobs as a dishwasher but he hasn't been hired. He did state

that one place was going to hire him but he would have been required to read the menu and he wasn't able to do that. He hasn't really looked for work in the last 6 months or so. He states that he does things around the house to help out such as takes out the garbage, sweeps the floor when it is dirty and chops wood about once a week. He states that his mom is the one who does all the cooking, cleaning and laundry. He states that his usual day consists of waking around 9am, getting dressed and eating breakfast of cereal. He then will go out and chop wood or watch TV. He eats lunch [and then] does nothing most of the afternoon but watch TV. They eat supper around 4pm [and] then he will go out and chop a little more wood to get them through the night. If the house isn't to[o] cold he will take a bath. He generally bathes every other night or 3 times per week. He states this might be a little less in the winter because they heat their house with wood and it is pretty cold in the evenings. He will then put on clean clothes and go to bed around 9pm. He states that somedays [sic] he will help Mary. Mary is his neighbor and he will usually go up to her house every morning to let her dog out to go to the bathroom while she is at work. He states he lives in a home with his mom and brother. The brother couldn't hear so he got on SSI but now he got a hearing aid so he can hear again. He states they have a big room upstairs with 3 beds. He states there is a partition in the middle and his mom sleeps on one side and he and his brother sleep on the other side. He does make his bed each day. He states he enjoys summers because he and his brother will go fishing at Sheratin Lake. His brother has a car so he generally drives the family where they need to go. The claimant does have a driver[']s license and can drive. When asked if he felt he was depressed the claimant answered that "I might be because I ain't working and I ain't got money to spend". He states that sometimes his mom will give him a little money but she is only getting a social security check and an IBP check from when his dad died. He thinks this is about $949. I asked the claimant what he would do with money if he had a job? He states he would help pay his brother's car payment, help with car insurance and help pay for grocery's [sic]. He states he would also buy himself pop and stuff for fishing.

> [Kliment's] mother, Nadine, . . . states she generally does all
> the of [sic] cooking and cleaning and laundry. They do have
> a washer/dryer in the house as well as hot water. She states
> that in August 2003 she broke her wrist and the claimant did
> all of the dishes, sweeping and making beds while she was
> unable to do it. She states they moved to SD in 2/02. She
> states the claimant has applied for different jobs but one job he
> had to be able to read to take orders for food. She does state
> that he shaves, showers and wears clean clothes when he
> applys [sic] for jobs. When asked about the claimant's
> depression Nadine states he is depressed because he doesn't
> have any money. She states he really isn't to[o] depressed and
> when he does get depressed he goes out along the road to
> collect cans for money [and] then he is happy. She states in
> the winter there aren't to[o] many cans but in the summer
> there are quite a few. She states he collects them [and then]
> "crunches" them [and] then the brother will take them into
> town for money.

(R. 239)

## 2. *Kliment's medical and educational history*

Kliment underwent a psychological evaluation on February 24, 2004, by Leslie A.
Fiferman, Ph.D. (R. 300-03) Dr. Fiferman administered psychological tests and a mental
status evaluation, and also consulted with Kliment's mother and brother, reaching the
following conclusions:

> The available standardized testing results in conjunction with
> the historical data and clinical observation all suggests that
> [Kliment] is functioning in the impaired range on most
> measures of psychological efficacy. This has apparently been
> a chronic pattern for him as he was picked up by the Special
> Education program starting as soon as he went to school.
> [Kliment] cannot function effectively on an independent basis
> and has only been able to do the most mundane job
> (dishwashing). He has not worked for the last two years and
> is unlikely to be employable or have his psychological
> problems improve in the foreseeable future. Current

standardized testing places [him] in the overall Mild M.R. range; Full Scale IQ 61 (0.5%), Verbal IQ 61 (0.5%), Performance IQ 68 (2%). [He] scored in the following ranges on the subtests of the memory testing: 1 subtest was in the Borderline range, 6 were in the Mild M.R. range and 1 was in the Moderate M.R. range.

(R. 300) Dr. Fiferman further opined Kliment would be unable to manage his own benefits should they be awarded. (*Id.*)

Dr. Fiferman recommended that Kliment "be considered impaired along the dimension of employability," noting he might benefit from special counseling and occupational programs. (R. 301) He assessed Kliment's current GAF at 42, and highest GAF in the past year of 49. Diagnoses included Major Depression, recurrent, moderate; Reading Disorder; Mathematics Disorder; Disorder of Written Expression; Mild Mental Retardation; and Schizoid, Avoidant Personality Traits. (R. 301)

On March 15, 2004, Jerome Buchkoski, Ph.D. reviewed the record and completed a Psychiatric Review Technique form (R. 241-54), and a Mental Residual Functional Capacity Assessment form (R. 255-58). He evaluated Kliment under Listing 12.05, Mental Retardation, based on Kliment's IQ scores. (*See* R. 241, 245) He opined Kliment would be moderately limited in restriction of the activities of daily living, difficulties maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace. (R. 251)

More specifically with regard to Kliment's work-related functional abilities, Dr. Buchkoski opined Kliment would be moderately limited in his ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and respond appropriately to changes in the work setting. He opined Kliment would be "not significantly limited" in his ability to remember locations and work-like procedures; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; complete a

normal workday and work week without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and set realistic goals or make plans independently of others. He indicated Kliment would have no limitation in his ability to understand, remember, and carry out very short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; make simple work-related decisions; be aware of normal hazards and take appropriate precautions; and travel in unfamiliar places or use public transportation. (R. 255-56) Dr. Buchkoski noted Kliment "has limited intellectual abilities which impact his ability to perform complex tasks." (R. 257)

On March 23, 2004, another medical consultant (whose signature is illegible) reviewed Dr. Buchkoski's evaluations and disagreed with some of his conclusions, finding there was insufficient evidence in the record to support Dr. Buchkoski's conclusions regarding some of Kliment's work-related mental abilities. (R. 259-62).

On April 22, 2004, Dr. Buchkoski completed another Psychiatric Review Technique form (R. 263-76), and another Mental Residual Functional Capacity Assessment form (R. 277-08). This time, he evaluated Kliment under Listing 12.04, Affective Disorders, noting Kliment had a "[d]epressed mood over lack of funds"; and 12.05, Mental Retardation, based on his IQ scores. (*See* R. 263, 266, 267) He found Kliment would have moderate limitation in the restriction of activities of daily living and difficulties maintaining social functioning, and marked limitation with regard to difficulties in maintaining concentration, persistence, or pace. (R. 273)

Dr. Buchkoski altered his assessment of Kliment's mental work-related functional limitations as follows. He opined Kliment would be moderately limited in the ability to understand, remember, and carry out detailed instructions; maintain attention and

concentration for extended periods; interact appropriately with the general public; maintain socially appropriate behavior and adhere to basic standard of neatness and cleanliness; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others. He found no evidence of limitation in Kliment's ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and to ask simple questions or request assistance. He rated Kliment as "not significantly limited" in all other areas. (R. 277-78) He noted Kliment's history indicates he can functional adequately in a work setting, his hygiene issues have been address and he now is bathing every other day and wearing clean clothes, and he has the ability to perform all activities of daily living "but may choose not to do so." (R. 279) The doctor concluded, "Overall it does not appear that [Kliment's] condition has changed since he was employed and [Mental Residual Functional Capacity] is consistent with past work." (*Id.*)

On June 8, 2005, Kliment was referred to Michael P. Baker, Ph.D. by a disability examiner for administration of the Wechsler Adult Intelligence Scale - III (WAIS-III). (R. 304-06) Kliment was observed to be "rather tense," "socially fearful," and nervous, but stated he was "usually 'happy'." (R. 305) Dr. Baker reached the following conclusions from the test results:

> Mr. Kliment appeared to do the best that he could on the testing. He was cooperative. He appears to be functioning in the extremely low range. He achieved Verbal IQ of 61, Performance IQ of 65, yielding a Full Scale IQ of 60. These scores place him at the .5, 1, and .1 percentile rank, respectively. Verbal Comprehension and Perceptual Organization were at indexes of 65 and 67 respectively, which are both at the 1st percentile rank. There is little variation amongst the subtests. Relative weakness was on the Comprehension subtest which measures judgment. Otherwise, all subtest[s] yielded scale scores between 3 and 5.
>
> Mr. Kliment would be in need of supervision in handling cash benefits. He reports inability to read and he is in the range of

> mild mental retardation. Mental limitations related to work
> activities would primar[i]ly involve remembering and
> understanding instructions, procedures, and locations. He
> would also appear to have difficulties carrying out those
> instructions calling for maintenance of attention, concentration
> and pace. Social anxiety also would interfere.

(*Id.*) Dr. Baker assessed Kliment's current GAF at 40, and diagnosed Kliment with an Anxiety disorder not otherwise specified. (*Id.*)

On June 25, 2005, Beverly Westra, Ph.D. reviewed the record and completed a Psychiatric Review Technique form (R. 281-94), and a Mental Residual Functional Capacity Assessment form (R. 295-99) She evaluated Kliment under Listing 12.05, Mental Retardation, based on his IQ scores, and Listing 12.06, Anxiety-Related Disorders, indicating he has an anxiety disorder not otherwise specified. (*See* R. 281, 285, 286) Dr. Westra found Kliment to have moderate functional limitations with regard to restriction of the activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace. (R. 291)

With regard to Kliment's mental work-related limitations, Dr. Westra opined he would be markedly limited in his ability to understand, remember, and carry out detailed instructions; moderately limited in his ability to remember locations and work-like procedures, maintain attention and concentration for extended periods, make simple work-related decisions, complete a normal workday and work week without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, respond appropriately to changes in the work setting, and set realistic goals or make plans independently of others. She found him to be "not significantly limited" in his ability to understand, remember, and carry out very short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination

with or proximity to others without being distracted by them; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. She found no evidence of limitation in Kliment's ability to be aware of normal hazards and take appropriate precautions, or his ability to travel in unfamiliar places or use public transportation. (R. 295-96) Another consultant reviewed the record on September 13, 2005, and concurred in Dr. Westra's conclusions. (R. 281)

On March 12, 2007, Dr. Mah-mood Syed, a psychologist for the Northwest Area Education Agency, wrote the following summary of Kliment's academic history:

> Lyle Kliment's evaluation from January of 1983 qualified him as a student with a mental retardation. Lyle received his academic and functional instructions in both the regular education and the resource room settings. File review indicates that Lyle's intellectual ability and adaptive behavior met the DSM-IV criteria for mental retardation. [His] Full Scale IQ on WIAS-R [sic] fell in the borderline range of intellectual functioning (Full Scale IQ: 73). This suggests that Lyle has lower ability than most children his age, which makes it difficult for Lyle to learn the skills needed to be successful in the areas of communication, pre-academic/academic skills, daily living skills, social skills, occupational/vocational skills, and independent living skills.
>
> Lyle's accommodations included: preferential seating, notes/handouts provided by the instructors, shortened assignments/tests, orally read tests (upon request), use of calculator if needed, frequent checks for understanding and small group setting if possible.

(R. 307)

### 3.    *Medical expert's testimony*

The ME listened to Kliment's testimony and also reviewed the record.  He stated that in his opinion, Kliment does not meet any of the Listings.  He acknowledged that Dr. Fiferman had diagnosed Kliment with major depressive disorder, recurrent, moderate, but the ME was unable to "find much in the way of symptom description to support that diagnosis." (R. 365)  In the record as a whole, the ME indicated he was unable to find sufficient criteria to establish a severe impairment under Listing 12.04 (Affective Disorders). (R. 366)

Regarding Listing 12.06 (Anxiety Related Disorders), the ME noted that Dr. Baker had diagnosed an anxiety disorder and indicated Kliment had problems during his evaluation with tension and anxiety.  The ME acknowledge that Kliment could have some "initial anxiety" in an "assessment situation," but he found no "indications of general anxiety outside that context." (*Id.*)  He also found no evidence that Kliment has been treated, either medically or with counseling, for anxiety or depression.  So although Kliment may have "some mild social anxiety," or "[p]ossibly some mild anxiety in general," the ME could not establish criteria under Listing 12.06 for any diagnosed condition.

Regarding Listing 12.08 (Personality Disorders), the ME also noted Dr. Fiferman had diagnosed "schizoid and avoidant traits," which the ME indicated was "short of a full diagnosis at any rate." (R. 366-67)  The ME noted Kliment had some anxiety during the examination which he found not to be unusual, "particularly for somebody that has cognitive limitations, and particularly in a novel setting." (R. 367)  He opined that once Kliment became acclimated to a particular situation, his anxiety no longer would be a problem. (*Id.*)

Turning to the diagnosis under Listing 12.05 (Mental Retardation), the ME noted the WAIS-III tests administered by both Dr. Fiferman and Dr. Baker yielded "essentially identical" results that showed Kliment's IQ "would be within the scope of the [Listing]

criteria." (*Id.*) The ME pointed out inconsistencies in Kliment's testimony regarding his actual abilities, such as Kliment's statement that he could not read more than very simple words, but the fact that he read and passed his driver's license test without assistance. The ME nevertheless stated he would be surprised if Kliment's functional limitations from an academic standpoint were "much above a borderline level." (R. 368) However, based on Kliment's description of his work activities, the ME opined Kliment would be "able to learn simple, one-, two-step sorts of instructions[,] [w]hich would be consistent with a limited level of ability, but not one that would preclude employment." (*Id.*) The ME stated this indicates Kliment is able to function "somewhat higher, it would appear, than strictly speaking the IQ tests in the record would suggest." (*Id.*)

In the ME's opinion, Kliment falls in the "borderline to possibly high upper . . . level," in an IQ range of 69 to 75. (*Id.*) As a result, Kliment would not meet or equal Listing 12.05 "because of his adaptive functioning." (R. 369) Although Kliment has some limitations in his adaptive functioning, and would be unable to manage his own funds, the ME indicated "it would appear that he has some residual capacity for employment-related activities." (*Id.*) He opined Kliment would have moderate restrictions overall in his activities of daily living, with some marked areas of restriction such as his hygiene. The ME stated Kliment "appears to need some support in some areas of daily activity, but . . . overall it appears moderate." (*Id.*)

The ME also opined Kliment's limitations in the area of social functioning would be moderate in general, but given his difficulty with his hygiene, his difficulty in social functioning would be marked. Kliment's poor hygiene is noted throughout the record, and the ME indicated this "would pose some definite problems socially for him." (R. 370) He opined Kliment might be able to function adequately in activities that take place outdoors, activities he could complete in isolation, or activities that are "inherently dirty." (*Id.*)

With regard to Kliment's difficulties in maintaining concentration, persistence, or pace, the ME opined Kliment would be mildly to moderately limited in performing simple one- or two-step activities, and markedly limited "[w]ith any significant degree of increasing complexity or detail." (*Id.*) He found no indications of decompensation in the record. (R. 371)

The ME indicated that the criteria in Listing 12.05 do not, standing alone, determine an individual's level of functional capacity. According to the ME, a determination that an individual is disabled also involves consideration of the individual's "real world behavior." (R. 342; *see* R. 372) Because Kliment worked as a dishwasher for an extended period of time at the substantial gainful activity level, the ME opined Kliment's impairment would not meet the listing level of severity under Listing 12.05. (R. 341-42) He indicated Kliment's test results fall in the range of mild mental retardation or borderline mental retardation. Considering "the whole person," the ME found Kliment's intellectual functioning to be borderline. (R. 373) He opined that Kliment's anxiety during the testing could have accounted for his lower scores on the tests. (*Id.*)

**4.      *Vocational expert's testimony***

The ALJ asked the VE the following question:

> Assume for purposes of all the following hypothetical questions the Claimant is 38 years of age, and has educational ability commensurate with a twelfth-grade education in special ed. His past relevant work is as a kitchen helper doing dishes. And this is an individual who clinical psychologist has defined as having borderline intellectual functioning. And the [12.04, 12.06, and 12.08] criteria are found non-severe within the meaning of Social Security. This is an individual who testified he can't read or write. However, he testified he read the driver's test once and passed. He also testified that he learned of the job at Mike's Saloon by reading the ad in the paper. This is an individual whose hygiene is poor. And Dr. England found that his restrictions of activities of daily living are

moderate, but they're marked in relationship to hygiene issues. And difficulties in maintaining social functioning, dealing with hygiene, are marked. Otherwise, they're moderate. And difficulties in maintaining concentration, persistence, and pace is mild to moderate with simple, unskilled, one- to two-step work. But marked if it's complex or complicated. And episodes of decompensation, each of an extended duration, are none. And there's no C criteria. This is an individual who the testimony shows that he chops wood, that he can sweep or vacuum around the house. Does not currently know how to do the laundry. Cooks but estimates how long to put it in the microwave, or asks his mother to read the instructions on the back of the package. He can sign his name on a check, but he can't write the other items on the check. He's never really handled money other than the money he gets from selling cans. He has no physical limitations. Can this individual do his past relevant work?

(R. 374-76)

The VE responded, "Under that hypothetical, . . . it would appear that he could." (R. 376) He based this response on the fact that Kliment "was doing that work before, and in his testimony he indicated that he left for reasons other than disability." (*Id.*) He indicated that under the above hypothetical, Kliment could "fulfill all aspects of that job, really. It is an unskilled job. The issue seems to be the hygiene issue, and it's out of my areas of expertise to determine whether that's a disability or something that's unavoidable by him." (*Id.*)

The VE further indicated that in general, a restaurant's employment of someone with Kliment's hygiene problem "would probably be a special condition," but only if poor hygiene is designated as a disability. (R. 377) In light of the fact that Kliment worked at Mike's Saloon for several years and was not let go because of his hygiene problem, it would not be a special condition as Kliment performed the job (*id.*), but as the job is performed in the national economy, "[i]t would be a special condition in the sense that most employers would expect hygiene to be at a higher level than what he displays it. And

. . . if the hygiene appears to be as his testimony and as in the record, then I think that employer would be hard pressed to keep him." (R. 378)

## 5.    *The ALJ's decision*

The ALJ found Kliment had not performed work at the substantial gainful activity level since his alleged disability onset date of July 1, 2002. (R. 18) She found Kliment has the medically-determinable impairment of "mild mental retardation," but the impairment does not rise to the Listing level of severity. (R. 18-19) The ALJ reviewed Kliment's past work history and reported daily activities, and concluded Kliment has the residual functional capacity for maximum sustained work activity. She concluded Kliment could return to his past relevant work as a kitchen helper and dishwasher, and he therefore is not disabled. (R. 19-22)

The ALJ found that "[n]otwithstanding Dr. Fiferman's diagnosis of a moderate recurrent depressive disorder, her mental status examination, except for very poor hygiene and grooming, was fairly unremarkable. There simply was no evidence of anhedonia, appetitie [sic] or sleep disturbance, psychomotor agi[t]ation or retardation, decreased energy, emotionally rather than intellectually-based difficulties with concentration, suicidal ideation or psychosis." (R. 19-20) The ALJ noted Kliment "has never been treated for emotional concerns and the record does not contain any allegations of emotional problems." (R. 20)

The ALJ relied on the VE's testimony that based on the ALJ's hypothetical question, Kliment's "past relevant work as a kitchen helper and dishwasher did not require abilities beyond those set forth in the residual functional capacity assessment[.]" (R. 22) The ALJ found Kliment's testimony regarding his functional abilities to be credible, and to be "generally consistent" with the ALJ's assessment of Kliment's residual functional capacity. (R. 21)

16

### III.  DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

#### A.  Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505.  A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations.  20 C.F.R. §§ 404.1520 & 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *Hillier v. Social Security Admin.*, 486 F.3d 359, 363 (8th Cir. 2007); *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003).  First, the Commissioner will consider a claimant's work activity.  If the claimant is engaged in substantial gainful activity, then the claimant is not disabled.  20 C.F.R. § 404.1520(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities."  *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003).  "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities."

*Kirby*, *supra*, 2007 WL 2593631 at *2 (citing *Bowen v. Yuckert*, 482 U.S. 137, 107 S. Ct. 2287, 98 L. Ed. 2d 119 (1987)).

The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)). *See Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) ("'The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work.' *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001), *citing Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996)."); *accord Kirby, supra*, 2007 WL 2593631.

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a

medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon*, *supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner

will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

## B. The Substantial Evidence Standard

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citing *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir. 1999), in turn citing *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998)); *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003). This review is deferential; the court "must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *accord Page* 484 F.3d at 1042 ("Substantial evidence is relevant evidence which a reasonable mind would accept as adequate to support the Commissioner's conclusion." Quoting *Haggard*, 175 F.3d at 594); *Pelkey, supra* (quoting *Goff*, 421 F.3d at 789).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Krogmeier*, 294 F.3d at 1022. The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall

evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline, supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier,* 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *accord Page*, 484 F.3d at 1042-43 (citing *Kelley v. Barnhart*, 372 F.3d 958, 961 (8th Cir. 2004); *Travis v.. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007); *Cox v. Barnhart*, 471 F.3d 902, 906 (8th Cir. 2006)).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d

386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987));

*Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S.

1075, 108 S. Ct. 1050, 98 L. Ed. 2d. 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823

F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not

discredit a claimant's subjective allegations of pain, discomfort or other disabling

limitations simply because there is a lack of objective evidence; instead, the ALJ may only

discredit subjective complaints if they are inconsistent with the record as a whole. *See*

*Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900

F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir.

1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the
> evidence presented relating to subjective complaints, including
> the claimant's prior work record, and observations by third
> parties and treating and examining physicians relating to such
> matters as:
>
> 1)      the claimant's daily activities;
> 2)      the duration, frequency and intensity of the pain;
> 3)      precipitating and aggravating factors;
> 4)      dosage, effectiveness and side effects of
>          medication;
> 5)      functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d

576, 580-81 (8th Cir. 2002). The court must "defer to the ALJ's determinations regarding

the credibility of testimony, so long as they are supported by good reasons and substantial

evidence." *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).


## IV. DISCUSSION

Kliment argues the ALJ erred in failing to find that his impairments meet or equal

Listing 12.05.C. The regulatory Listing provides as follows:

12.05   Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

*   *   *

C.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

20 C.F.R. pt. 404, subpt. P, App. 1, § 12.05.C.

Kliment notes that the ALJ did not make a finding regarding whether his mild mental retardation began before age twenty-two. However, the record demonstrates that Kliment attended special education classes in school and was provided with special accommodations to complete tests. (*See* R. 307) Dr. Syed found that at least as of 1983, when Kliment was 19 years of age, his "intellectual ability and adaptive behavior met the DSM-IV criteria for mental retardation." (*Id.*) All three of the state agency consultants also found that Kliment's "[s]ignificantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., . . . before age 22." (R. 245, 267, 285) Thus, the record demonstrates that the first two criteria under Listing 12.05(C) are met: Kliment has a full-scale IQ of 60 through 70, and his impairment was evident before he reached age 22. *See Maresh v. Barnhart*, 438 F.3d 897, 899 (8th Cir. 2006) (listing the three requirements for a claimant to meet Listing 12.05C).

The third criterion under Listing 12.05(C) is the presence of some other physical or mental impairment that imposes "an additional and significant work-related limitation of function." There is no dispute that Kliment has no physical impairments that affect his ability to work. The issue, then, is whether he has another mental impairment that

imposes work-related limitations. The Commissioner argues the other mental impairment "must be a 'severe' impairment as that term is defined in §§ 404.1520(c) and 416.920(c), i.e., an impairment that would be considered to be 'severe' at step two of the sequential evaluation process." Doc. No. 9, p. 10 (citing *Maresh*, 438 F.3d at 899-900). The regulations define a "severe" impairment as one that "significantly limits" an individual's "ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.930(c). As noted by the *Maresh* court, this means the individual's impairment must have "a 'more than slight or minimal' effect on the ability to perform work." *Maresh*, 438 F.3d at 900 (quoting *Buckner v. Apfel*, 213 F.3d 1006, 1011 (8th Cir. 2000) (additional citation omitted).

The ALJ found no evidence to support a conclusion that Kliment has another severe mental impairment. The ALJ noted, properly, that the record does not support Dr. Fiferman's diagnosis of major depression. However, the court finds the ALJ failed to consider fully Dr. Baker's diagnosis of an Anxiety disorder. The ALJ further failed to consider the fact that both of the state agency consultants who actually examined Kliment assessed his Global Assessment of Functioning at levels that would indicate severe limitations. Dr. Fiferman assessed Kliment's GAF at 42 with a previous-year high of 49, and Dr. Baker assessed Kliment's current GAF at 40.

"[T]he Global Assessment of Functioning Scale is used to report the clinician's judgment of the individual's overall level of functioning." *Juszczyk v. Astrue*, 542 F.3d 626, 627 n.2 (8th Cir. 2008) (internal quotation marks, citations omitted). "A GAF between 41 and 50 indicates serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Morgan v. Commissioner of Social Security*, 169 F.3d 595, 598 n.1 (9th Cir. 1999). Although "[t]he GAF is not an absolute determiner of ability to work," *Stalvey v. Apfel*, 1999 W.L. 626133 (10th Cir. 1998), it is error for an ALJ to fail to consider or discuss consistent GAF scores below 50. *Pate-*

*Fires v. Astrue*, 564 F.3d 935, 944 (8th Cir. 2009) (citing, *inter alia, Brueggemann v. Barnhart*, 348 F.3d 689, 695 (8th Cir. 2003) (GAF score of 50 "reflects serious limitations in the patient's general ability to perform basic tasks of daily life, and the record shows that the VE considered a claimant with a GAF of 50 unable to find any work"); *Golubchick v. Barnhart*, 2004 WL 1790188, at *7 (E.D.N.Y. Aug. 9, 2004) (where "the medical expert[] admitted that a GAF of below fifty is generally recognized as precluding job activities on a sustained basis"); *Mook v. Barnhart*, 2004 WL 955327, at *6 (D. Kan. Apr. 26, 2004) (noting VE's testimony that a GAF of 50 "would eliminate all jobs"); *cf. Conklin v. Astrue*, ___ F.3d ___, 2010 WL 114551, at *2 (8th Cir. Jan. 14, 2010) (citing *Pate-Fires* with approval).

Dr. Fiferman concluded from the psychological testing and mental status evaluation that Kliment was "functioning in the impaired range on most measures of psychological efficacy." (R. 300) Among other things, Dr. Fiferman diagnosed Kliment with a Reading Disorder, Mathematics Disorder, and Disorder of Written Expression (R. 301), all of which are well supported by the evidence of record. These impairments, together with Kliment's consistently low GAF, suggest Kliment would be unable to sustain employment over time. The ALJ failed to consider the totality of the evidence, and failed to give proper weight to the opinions of the two psychologists who actually examined Kliment.

Kliment further argues the ALJ failed to present a proper hypothetical question to the VE. If a hypothetical question does not encompass all relevant impairments, the vocational expert's testimony does not constitute substantial evidence to support the ALJ's finding of no disability. *Cruze v. Chater*, 85 F.3d 1320, 1323 (8th Cir. 1996) (citing *Hinchey v. Shalala*, 29 F.3d 428, 432 (8th Cir. 1994)). A "proper hypothetical question presents to the vocational expert a set of limitations that mirror those of the claimant." *Hutton v. Apfel*, 175 F.3d 651, 656 (9th Cir. 1999). Here, the ALJ's hypothetical question to the VE failed to encompass all of Kliment's relevant impairments. The question was based on an individual 38 years of age (R. 374), when Kliment was 42 years of age at his

alleged disability onset date, and 45 years of age at the time of the hearing.  The question did not include Kliment's GAF or full scale IQ scores, which the Eighth Circuit has observed to be "certainly pieces of the hypothetical puzzle necessary to gain an accurate overall assessment of [a claimant's] functioning." *Wilson v. Astrue*, 493 F.3d 965, 968 (8th Cir. 2007).  The question did not even include Kliment's mild mental retardation as an impairment, instead stating he has "borderline intellectual functioning." (R. 375)  The court finds the hypothetical question posed to the VE failed to present a set of limitations that mirror Kliment's, with the result that the VE's testimony cannot be considered substantial evidence.  *Cruz*, 85 F.3d at 1323; *see Wiekamp v. Apfel*, 116 F. Supp. 2d. 1056, 1073-74 (N.D. Iowa 2000) (Bennett, C.J.).

Although Kliment argues the "evidence is overwhelming and clear" that he meets Listing 12.05.C (Doc. No. 8, p. 15; Doc. No. 10, p. 9), the court does not find that the evidence of record overwhelmingly supports an immediate finding of disability and award of benefits.  The court is unable to determine whether the ALJ would have reached the same decision to deny Kliment benefits had she given appropriate weight to the medical evidence and posed a proper hypothetical question to the VE.  As a result, this matter should be remanded to the Commissioner for further administrative proceedings and reconsideration of Kliment's claims.

## V.  CONCLUSION

For the reasons discussed above, **IT IS RESPECTFULLY RECOMMENDED**, unless any party files objections[2] to the Report and Recommendation in accordance with 28 U.S.C. § 636 (b)(1) and Fed. R. Civ. P. 72(b), within fourteen (14) days of the service

---

[2]Objections must specify the parts of the report and recommendation to which objections are made, as well as the parts of the record forming the basis for the objections.  *See* Fed. R. Civ. P. 72.

of a copy of this Report and Recommendation, that the Commissioner's decision be reversed, and this case be remanded for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

**DATED** this 23rd day of February, 2010.

PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT