# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

LYLE J. KLIMENT,

        Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

No. C 09-4030-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING
MAGISTRATE JUDGE'S REPORT
AND RECOMMENDATION**

---

## TABLE OF CONTENTS

*I. INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *A. Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *B. Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
       *1.*    *Introductory facts and Kliment's hearing testimony* . . . . . . . . 5
       *2.*    *Kliment's medical and educational history* . . . . . . . . . . . . . 9
       *3.*    *Medical expert's testimony* . . . . . . . . . . . . . . . . . . . . . . . 15
       *4.*    *Vocational expert's testimony* . . . . . . . . . . . . . . . . . . . . . 18
       *5.*    *The ALJ's decision* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*II. LEGAL STANDARDS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*III. LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
   *A. Listing 12.05(C)* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
   *B. Vocational Expert's Hypothetical* . . . . . . . . . . . . . . . . . . . . . 36

*IV. DIRECTIONS ON REMAND* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*V. CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

# I. INTRODUCTION

## A. Procedural Background

On April 28, 2005, Plaintiff Lyle Kliment filed applications for Title II[1] disability insurance and Title XVI[2] supplemental security income benefits, alleging a disability onset date of July 1, 2002. Kliment claims that he is disabled because he cannot read or write—he claims to have a learning disability. This alleged condition prevents him from getting "any better jobs other than dishwasher due to my condition. I can't run a cash register or computer or be a cook because I can't read the orders or handle money." R. at 147. Kliment's applications were denied initially and on reconsideration. An Administrative Law Judge ("ALJ") held a hearing, as requested, on Kliment's claims on May 9, 2008. The ALJ issued a decision on May 29, 2008, which found that Kliment was mildly mentally retarded but did not have an impairment that met the Listing level of severity. The ALJ also found that Kliment retained the residual functional capacity for "maximum sustained work activity" and that he could "perform his past relevant work as a kitchen helper and dishwasher." R. at 22. For these reasons, the ALJ found Kliment was not disabled. On March 16, 2009, the Social Security Appeals Council denied Kliment's request to review the ALJ's decision, and this denial constituted a final decision of the Commissioner of Social Security ("Commissioner").

On March 31, 2009, Kliment filed a complaint in this court seeking review of the Commissioner's decision (docket no. 3). The case was referred to Chief United States

---

[1]Title II of the Social Security Act provides insurance benefits to individuals who establish that they suffer from a physical or mental disability. *See* 42 U.S.C. § 423.

[2]Title XVI of the Social Security Act provides supplemental income to individuals who are disabled while also indigent. *See* 42 U.S.C. § 1382.

Magistrate Judge Paul A. Zoss for a report and recommendation, in accordance with Administrative Order #1447.

On June 16, 2009, Kliment filed his brief (docket no. 8). In his brief, Kliment claimed: 1) That there is not substantial evidence in the record to support the ALJ's determination at step three of the familiar five-step analysis found in 20 C.F.R. § 404.1520, *see Jones v. Barnhart*, 335 F.3d 697, 699 (8th Cir. 2003), that Kliment did not meet or equal the conditions in Listing 12.05(C) and, specifically, that there is not substantial evidence in the record to support the ALJ's failure to find a second medically determinable impairment; 2) That the ALJ failed to pose a hypothetical question to the Vocational Expert ("VE") witness that clearly presents a set of limitations that mirror Kliment's; and 3) that the ALJ failed to determine and communicate a residual functional capacity specific enough to determine if Kliment is disabled.

The Commissioner filed his brief on July 2, 2009 (docket no. 9). According to the Commissioner, the ALJ's decision that Kliment did not meet or equal the requirements for Listing 12.05(C) is supported by substantial evidence in the record. The Commissioner also argues that the ALJ properly found that Kliment could perform his past relevant work. In the event the court finds that the ALJ's decision is not supported by substantial evidence, the Commissioner asks the court to remand the case for further consideration.

On February 23, 2010, Judge Zoss issued his Report and Recommendation (docket no. 12). Judge Zoss found that two of the three requirements under 12.05(C) were met, as he found Kliment has a full-scale IQ of 60 through 70 and his impairment was evident before the age of 22. Judge Zoss agreed with the ALJ's finding that the record did not support a diagnosis of major depression. However, Judge Zoss found that the ALJ failed to fully consider Dr. Baker's diagnosis of anxiety disorder. Judge Zoss also found that the ALJ failed to consider the fact that both of the state agency consultants who actually

examined Kliment assessed his Global Assessment Functioning ("GAF") at levels that would indicate severe limitations. The low GAF, along with a Reading Disorder, Mathematics Disorder, and Disorder of Written Expression, suggested to Judge Zoss that Kliment would be unable to sustain employment over time.

Judge Zoss further found that the ALJ's hypothetical question to the Vocational Expert ("VE") failed to encompass all of Kliment's relevant impairments. The impairments Judge Zoss found to be missing, or improperly communicated, in the ALJ's hypothetical were: 1) the fact that the question was based on an individual 38 years of age when Kliment was 42 years of age at his alleged disability onset date and 45 years of age at the time of the hearing; 2) the question did not state Kliment's GAF or IQ scores; and 3) the question did not include Kliment's mild mental retardation but only stated that he has borderline intellectual functioning. Because of the hypothetical question's omissions, Judge Zoss found that the VE's testimony was without adequate support in the record. Although Judge Zoss observed these errors, he did not find that there was overwhelming evidence in the record to justify an immediate finding of disability and award of benefits.

On March 9, 2010, Kliment filed his Objections to the Magistrate Judge's Report and Recommendation (docket no. 13). In his objections, Kliment only objects to Judge Zoss's conclusion that the case needs to be remanded for further proceedings. Kliment argues that, instead of remanding the case for further proceedings, the court should remand the case for an immediate award of benefits. Kliment notes that Judge Zoss found the first two requirements under 12.05(C) were met and also allegedly found that the third requirement was met due to Kliment's other disorders and low GAF score. Therefore, Kliment argues that Judge Zoss's findings should be affirmed in all respects except that this court should find that there is overwhelming evidence that Kliment should be found disabled at Step 3, under Listing 12.05(C).

The Commissioner filed his Response to Plaintiff's Objections to the United States Magistrate Judge's Report and Recommendation (docket no. 14) on March 16, 2010. The Commissioner's response claims that reversal for payment of benefits is not appropriate in this case and does not provide additional arguments in support of his position.

## B. Factual Background

In Judge Zoss's Report and Recommendation, the following findings of fact were made:

### 1. Introductory facts and Kliment's hearing testimony

Kliment was born in 1964, and was forty-five years old at the time of the hearing.[3] He is 5'9" tall and weighs 120 pounds. He graduated from high school, receiving some of his instruction in special education classes. (*See* R. 307) He lives in a one-story house with his 79-year-old mother and his brother. (R. 350-51) His mother and brother pay all of the household expenses. (R. 352) His brother is hard of hearing and receives Supplemental Security Income benefits. (*Id.*)

Kliment's last job was at Mike's Saloon in Sioux City. He hand-washed dishes, mopped the floor, took out the garbage, and vacuumed the rug. (R. 345-46) He washed the walls once or twice, but he had no other duties on the job and no decision-making responsibilities. (R. 356-58, 363) When he started the job, he had never washed dishes by hand before, but his employer trained him for this job, including how much soap to add, how to dry the dishes, and where to put them. (R. 363) Kliment left the job at Mike's in July 2002, when his family moved out of town. (R. 351) When they returned to

---

[3] The ALJ's decision erroneously states Kliment was "currently 44 years of age." The hearing was held on Kliment's 45th birthday. In addition, in the ALJ's hypothetical question to the Vocational Expert, the ALJ erroneously identifies an individual "38 years of age." (R. 374)

Sioux City, he did not return to working at Mike's because it was "too far to drive." (R. 347) He has a driver's license but does not like to drive. (*Id*.)

Kliment is able to read "little words" but not "big words." (*Id*.) He read the driver's license test without assistance. (*Id*.) He stated he cannot read a want ad in the paper, but he also stated he had "seen an ad in the paper" for the job at Mike's Saloon (R. 348), and he has seen other ads in the paper for dishwashing jobs (R. 358). Besides his reading problems, Kliment has difficulty writing. When he applied for the job at Mike's, his mother filled out the employment application for him. (R. 348) He is able to sign his name but has never written a check. (R. 353) His mother reads most things for him, including things like instructions on microwave meals. (R. 355) He does not believe he could comprehend any type of complex instructions well enough to follow them, even if someone showed him what to do. (R. 363)

On a typical day, Kliment will get up in the morning and watch television. In the afternoon, he will go out looking for cans to redeem. Collecting cans is his only source of income; he does not receive any type of public assistance or food stamps. He does not know how to do laundry or cook, and he has never lived alone. (R. 348-49, 352-53) He does not know how to make a bed. His mother was incapacitated for a time from a broken wrist, and Kliment swept the floor and did the dishes at the residence but he did not cook or do laundry. He got food from "restaurants and stuff." (R. 349-50) He can do some minimal shopping by himself and is able to count out small change. (R. 358-59) He has ridden a bus on occasion, and he once got a telephone number from a telephone book without assistance. (R. 359) He sometimes goes to church with his mother and brother, but he does not belong to any other organizations. (R. 360) For recreation, he plays bingo and goes to the stock car races. He watches television, including the 10:00 p.m. news. (R. 360)

Kliment's representative asked him about his personal hygiene, noting Kliment's boss at Mike's Saloon had indicated he has body odor, his clothes are dirty, and his hair usually is messed up. Kliment indicated that is one reason he was not allowed to work around food at Mike's. (R. 361) Kliment and his mother used to go have coffee at Hy-Vee, but they were told they "can't go inside there anymore because of [their] body odor." (*Id.*) Kliment stated he does not like to take showers, and when he does take a shower, then he does not have clean clothes to put on. (R. 362)

In connection with Kliment's applications for benefits, the Social Security Administration sent him to see a doctor for an evaluation. According to Kliment, the doctor "had me do something with blocks and pictures and something else, and that stuff." (R. 354) His mother and brother took him to the evaluation. (*Id.*)

On April 15, 2004 (four years before the ALJ hearing), a Social Security representative talked with Kliment and his mother in connection with his application for benefits. The representative noted the following regarding Kliment's activities of daily living:

> The claimant states that he left his job in Sioux City to get land from his grandfather. He states he applied a few places for jobs as a dishwasher but he hasn't been hired. He did state that one place was going to hire him but he would have been required to read the menu and he wasn't able to do that. He hasn't really looked for work in the last 6 months or so. He states that he does things around the house to help out such as takes out the garbage, sweeps the floor when it is dirty and chops wood about once a week. He states that his mom is the one who does all the cooking, cleaning and laundry. He states that his usual day consists of waking around 9 am, getting dressed and eating breakfast of cereal. He then will go out and chop wood or watch TV. He eats lunch [and then] does nothing most of the afternoon but watch TV. They eat supper around 4pm [and] then

7

he will go out and chop a little more wood to get them through the night.  If the house isn't to[o] cold he will take a bath.  He generally bathes every other night or 3 times per week.  He states this might be a little less in the winter because they heat their house with wood and it is pretty cold in the evenings.  He will then put on clean clothes and go to bed around 9pm.  He states that somedays [sic] he will help Mary.  Mary is his neighbor and he will usually go up to her house every morning to let her dog out to go to the bathroom while she is at work.  He states he lives in a home with his mom and brother.  The brother couldn't hear so he got on SSI but now he got a hearing aid so he can hear again.  He states they have a big room upstairs with 3 beds.  He states there is a partition in the middle and his mom sleeps on one side and he and his brother sleep on the other side.  He does make his bed each day.  He states he enjoys summers because he and his brother will go fishing at Sheratin Lake.  His brother has a car so he generally drives the family where they need to go.  The claimant does have a driver[']s license and can drive.  When asked if he felt he was depressed the claimant answered that "I might be because I ain't working and I ain't got money to spend".  He states that sometimes his mom will give him a little money but she is only getting a social security check and an IBP check from when his dad died.  He thinks this is about $949.  I asked the claimant what he would do with money if he had a job?  He states he would help pay his brother's car payment, help with car insurance and help pay for grocery's [sic].  He states he would also buy himself pop and stuff for fishing.

[Kliment's] mother, Nadine, . . . states she generally does all the of [sic] cooking and cleaning and laundry.  They do have a washer/dryer in the house as well as hot water.  She states that in August 2003 she broke her

wrist and the claimant did all of the dishes, sweeping and making beds while she was unable to do it. She states they moved to SD in 2/02. She states the claimant has applied for different jobs but one job he had to be able to read to take orders for food. She does state that he shaves, showers and wears clean clothes when he applys [sic] for jobs. When asked about the claimant's depression Nadine states he is depressed because he doesn't have any money. She states he really isn't to[o] depressed and when he does get depressed he goes out along the road to collect cans for money [and] then he is happy. She states in the winter there aren't to[o] many cans but in the summer there are quite a few. She states he collects them [and then] "crunches" them [and] then the brother will take them into town for money.

(R. 239)

## 2.    *Kliment's medical and educational history*

Kliment underwent a psychological evaluation on February 24, 2004, by Leslie A. Fiferman, Ph.D. (R. 300-03) Dr. Fiferman administered psychological tests and a mental status evaluation, and also consulted with Kliment's mother and brother, reaching the following conclusions:

The available standardized testing results in conjunction with the historical data and clinical observation all suggests that [Kliment] is functioning in the impaired range on most measures of psychological efficacy. This has apparently been a chronic pattern for him as he was picked up by the Special Education program starting as soon as he went to school. [Kliment] cannot function effectively on an independent basis and has only been able to do the most mundane job (dishwashing). He has not worked for the last two years and is unlikely to be employable or have his psychological problems improve in the foreseeable future. Current standardized testing places [him] in the overall Mild M.R. range; Full Scale

9

> IQ 61 (0.5%), Verbal IQ 61 (0.5%), Performance IQ
> 68 (2%). [He] scored in the following ranges on the
> subtests of the memory testing: 1 subtest was in the
> Borderline range, 6 were in the Mild M.R. range and
> 1 was in the Moderate M.R. range.

(R. 300) Dr. Fiferman further opined Kliment would be unable to manage his own benefits should they be awarded. (*Id.*)

Dr. Fiferman recommended that Kliment "be considered impaired along the dimension of employability," noting he might benefit from special counseling and occupational programs. (R. 301) He assessed Kliment's current GAF at 42, and highest GAF in the past year of 49. Diagnoses included Major Depression, recurrent, moderate; Reading Disorder; Mathematics Disorder; Disorder of Written Expression; Mild Mental Retardation; and Schizoid, Avoidant Personality Traits. (R. 301)

On March 15, 2004, Jerome Buchkoski, Ph.D. reviewed the record and completed a Psychiatric Review Technique form (R. 241-54), and a Mental Residual Functional Capacity Assessment form (R. 255-58). He evaluated Kliment under Listing 12.05, Mental Retardation, based on Kliment's IQ scores. (*See* R. 241, 245) He opined Kliment would be moderately limited in restriction of the activities of daily living, difficulties maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace. (R. 251)

More specifically with regard to Kliment's work-related functional abilities, Dr. Buchkoski opined Kliment would be moderately limited in his ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and respond appropriately to changes in the work setting. He opined Kliment would be "not significantly limited" in his ability to remember locations and work-like

procedures; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; complete a normal workday and work week without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and set realistic goals or make plans independently of others. He indicated Kliment would have no limitation in his ability to understand, remember, and carry out very short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; make simple work-related decisions; be aware of normal hazards and take appropriate precautions; and travel in unfamiliar places or use public transportation. (R. 255-56) Dr. Buchkoski noted Kliment "has limited intellectual abilities which impact his ability to perform complex tasks." (R. 257)

On March 23, 2004, another medical consultant (whose signature is illegible) reviewed Dr. Buchkoski's evaluations and disagreed with some of his conclusions, finding there was insufficient evidence in the record to support Dr. Buchkoski's conclusions regarding some of Kliment's work-related mental abilities. (R. 259-62).

On April 22, 2004, Dr. Buchkoski completed another Psychiatric Review Technique form (R. 263-76), and another Mental Residual Functional Capacity Assessment form (R. 277-08). This time, he evaluated Kliment under Listing 12.04, Affective Disorders, noting Kliment had a "[d]epressed mood over lack of funds"; and 12.05, Mental Retardation, based on his IQ scores. (*See* R. 263, 266, 267) He found Kliment would have moderate limitation in the restriction of activities of daily living and difficulties maintaining social

functioning, and marked limitation with regard to difficulties in maintaining concentration, persistence, or pace. (R. 273)

Dr. Buchkoski altered his assessment of Kliment's mental work-related functional limitations as follows. He opined Kliment would be moderately limited in the ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; interact appropriately with the general public; maintain socially appropriate behavior and adhere to basic standard[s] of neatness and cleanliness; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others. He found no evidence of limitation in Kliment's ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and to ask simple questions or request assistance. He rated Kliment as "not significantly limited" in all other areas. (R. 277-78) He noted Kliment's history indicates he can function[] adequately in a work setting, his hygiene issues have been address[ed] and he now is bathing every other day and wearing clean clothes, and he has the ability to perform all activities of daily living "but may choose not to do so." (R. 279) The doctor concluded, "Overall it does not appear that [Kliment's] condition has changed since he was employed and [Mental Residual Functional Capacity] is consistent with past work." (*Id.*)

On June 8, 2005, Kliment was referred to Michael P. Baker, Ph.D. by a disability examiner for administration of the Wechsler Adult Intelligence Scale - III (WAIS-III). (R. 304-06) Kliment was observed to be "rather tense," "socially fearful," and nervous, but stated he was "usually 'happy'." (R. 305) Dr. Baker reached the following conclusions from the test results:

> Mr. Kliment appeared to do the best that he could on the testing. He was cooperative. He appears to be functioning in the extremely low range. He achieved Verbal IQ of 61, Performance IQ of 65, yielding a Full Scale IQ of 60. These scores place him at the .5, 1,

and .1 percentile rank, respectively. Verbal Comprehension and Perceptual Organization were at indexes of 65 and 67 respectively, which are both at the 1st percentile rank. There is little variation amongst the subtests. Relative weakness was on the Comprehension subtest which measures judgment. Otherwise, all subtest[s] yielded scale scores between 3 and 5.

Mr. Kliment would be in need of supervision in handling cash benefits. He reports inability to read and he is in the range of mild mental retardation. Mental limitations related to work activities would primar[i]ly involve remembering and understanding instructions, procedures, and locations. He would also appear to have difficulties carrying out those instructions calling for maintenance of attention, concentration and pace. Social anxiety also would interfere.

(*Id.*) Dr. Baker assessed Kliment's current GAF at 40, and diagnosed Kliment with an Anxiety disorder not otherwise specified. (*Id.*)

On June 25, 2005, Beverly Westra, Ph.D. reviewed the record and completed a Psychiatric Review Technique form (R. 281-94), and a Mental Residual Functional Capacity Assessment form (R. 295-99) She evaluated Kliment under Listing 12.05, Mental Retardation, based on his IQ scores, and Listing 12.06, Anxiety-Related Disorders, indicating he has an anxiety disorder not otherwise specified. (*See* R. 281, 285, 286) Dr. Westra found Kliment to have moderate functional limitations with regard to restriction of the activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace. (R. 291)

With regard to Kliment's mental work-related limitations, Dr. Westra opined he would be markedly limited in his ability to understand, remember, and carry out detailed instructions; moderately limited in his ability to remember locations and work-like procedures, maintain attention and

concentration for extended periods, make simple work-related decisions, complete a normal workday and work week without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, respond appropriately to changes in the work setting, and set realistic goals or make plans independently of others. She found him to be "not significantly limited" in his ability to understand, remember, and carry out very short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. She found no evidence of limitation in Kliment's ability to be aware of normal hazards and take appropriate precautions, or his ability to travel in unfamiliar places or use public transportation. (R. 295-96) Another consultant reviewed the record on September 13, 2005, and concurred in Dr. Westra's conclusions. (R. 281)

On March 12, 2007, Dr. Mah-mood Syed, a psychologist for the Northwest Area Education Agency, wrote the following summary of Kliment's academic history:

Lyle Kliment's evaluation from January of 1983 qualified him as a student with a mental retardation. Lyle received his academic and functional instructions in both the regular education and the resource room settings. File review indicates that Lyle's intellectual ability and adaptive behavior met the DSM-IV criteria for mental retardation. [His] Full Scale IQ on WIAS-R [sic] fell in the borderline range of intellectual functioning (Full Scale IQ: 73). This suggests that Lyle

has lower ability than most children his age, which makes it difficult for Lyle to learn the skills needed to be successful in the areas of communication, pre-academic/academic skills, daily living skills, social skills, occupational/vocational skills, and independent living skills.

Lyle's accommodations included: preferential seating, notes/handouts provided by the instructors, shortened assignments/tests, orally read tests (upon request), use of calculator if needed, frequent checks for understanding and small group setting if possible.

(R. 307)

### 3. *Medical expert's testimony*

The ME listened to Kliment's testimony and also reviewed the record. He stated that in his opinion, Kliment does not meet any of the Listings. He acknowledged that Dr. Fiferman had diagnosed Kliment with major depressive disorder, recurrent, moderate, but the ME was unable to "find much in the way of symptom description to support that diagnosis." (R. 365) In the record as a whole, the ME indicated he was unable to find sufficient criteria to establish a severe impairment under Listing 12.04 (Affective Disorders). (R. 366)

Regarding Listing 12.06 (Anxiety Related Disorders), the ME noted that Dr. Baker had diagnosed an anxiety disorder and indicated Kliment had problems during his evaluation with tension and anxiety. The ME acknowledge[d] that Kliment could have some "initial anxiety" in an "assessment situation," but he found no "indications of general anxiety outside that context." (*Id.*) He also found no evidence that Kliment has been treated, either medically or with counseling, for anxiety or depression. So although Kliment may have "some mild social anxiety," or "[p]ossibly some mild anxiety in general," the ME could not establish criteria under Listing 12.06 for any diagnosed condition.

Regarding Listing 12.08 (Personality Disorders), the ME also noted Dr. Fiferman had diagnosed "schizoid and avoidant traits," which the ME indicated was "short of a full diagnosis at any rate." (R. 366-67) The ME noted Kliment had some anxiety during the examination which he found not to be unusual, "particularly for somebody that has cognitive limitations, and particularly in a novel setting." (R. 367) He opined that once Kliment became acclimated to a particular situation, his anxiety no longer would be a problem. (*Id.*)

Turning to the diagnosis under Listing 12.05 (Mental Retardation), the ME noted the WAIS-III tests administered by both Dr. Fiferman and Dr. Baker yielded "essentially identical" results that showed Kliment's IQ "would be within the scope of the [Listing] criteria." (*Id.*) The ME pointed out inconsistencies in Kliment's testimony regarding his actual abilities, such as Kliment's statement that he could not read more than very simple words, but the fact that he read and passed his driver's license test without assistance. The ME nevertheless stated he would be surprised if Kliment's functional limitations from an academic standpoint were "much above a borderline level." (R. 368) However, based on Kliment's description of his work activities, the ME opined Kliment would be "able to learn simple, one [to] two-step sorts of instructions[,] [w]hich would be consistent with a limited level of ability, but not one that would preclude employment." (*Id.*) The ME stated this indicates Kliment is able to function "somewhat higher, it would appear, than strictly speaking the IQ tests in the record would suggest." (*Id.*)

In the ME's opinion, Kliment falls in the "borderline to possibly high upper . . . level," in an IQ range of 69 to 75. (*Id.*) As a result, Kliment would not meet or equal Listing 12.05 "because of his adaptive functioning." (R. 369) Although Kliment has some limitations in his adaptive functioning, and would be unable to manage his own funds, the ME indicated "it would appear that he has some residual capacity for employment-related activities." (*Id.*) He opined Kliment would have moderate restrictions overall in his

activities of daily living, with some marked areas of restriction such as his hygiene. The ME stated Kliment "appears to need some support in some areas of daily activity, but . . . overall it appears moderate." (*Id.*)

The ME also opined Kliment's limitations in the area of social functioning would be moderate in general, but given his difficulty with his hygiene, his difficulty in social functioning would be marked. Kliment's poor hygiene is noted throughout the record, and the ME indicated this "would pose some definite problems socially for him." (R. 370) He opined Kliment might be able to function adequately in activities that take place outdoors, activities he could complete in isolation, or activities that are "inherently dirty." (*Id.*)

With regard to Kliment's difficulties in maintaining concentration, persistence, or pace, the ME opined Kliment would be mildly to moderately limited in performing simple one- or two-step activities, and markedly limited "[w]ith any significant degree of increasing complexity or detail." (*Id.*) He found no indications of decompensation in the record. (R. 371)

The ME indicated that the criteria in Listing 12.05 do not, standing alone, determine an individual's level of functional capacity. According to the ME, a determination that an individual is disabled also involves consideration of the individual's "real world behavior." (R. 342; *see* R. 372) Because Kliment worked as a dishwasher for an extended period of time at the substantial gainful activity level, the ME opined Kliment's impairment would not meet the listing level of severity under Listing 12.05. (R. 341-42) He indicated Kliment's test results fall in the range of mild mental retardation or borderline mental retardation. Considering "the whole person," the ME found Kliment's intellectual functioning to be borderline. (R. 373) He opined that Kliment's anxiety during the testing could have accounted for his lower scores on the tests. (*Id.*)

### 4. *Vocational expert's testimony*

The ALJ asked the VE the following question:

> Assume for purposes of all the following hypothetical questions the Claimant is 38 years of age, and has educational ability commensurate with a twelfth-grade education in special ed. His past relevant work is as a kitchen helper doing dishes. And this is an individual who [a] clinical psychologist has defined as having borderline intellectual functioning. And the [12.04, 12.06, and 12.08] criteria are found non-severe within the meaning of Social Security. This is an individual who testified he can't read or write. However, he testified he read the driver's test once and passed. He also testified that he learned of the job at Mike's Saloon by reading the ad in the paper. This is an individual whose hygiene is poor. And Dr. England found that his restrictions of activities of daily living are moderate, but they're marked in relationship to hygiene issues. And difficulties in maintaining social functioning, dealing with hygiene, are marked. Otherwise, they're moderate. And difficulties in maintaining concentration, persistence, and pace is mild to moderate with simple, unskilled, one- to two-step work. But marked if it's complex or complicated. And episodes of decompensation, each of an extended duration, are none. And there's no C criteria. This is an individual who the testimony shows that he chops wood, that he can sweep or vacuum around the house. Does not currently know how to do the laundry. Cooks but estimates how long to put it in the microwave, or asks his mother to read the instructions on the back of the package. He can sign his name on a check, but he can't write the other items on the check. He's never really handled money other than the money he gets from selling cans. He has no physical limitations. Can this individual do his past relevant work?

(R. 374-76)

The VE responded, "Under that hypothetical, . . . it would appear that he could." (R. 376) He based this response on the fact that Kliment "was doing that work before, and in his testimony he indicated that he left for reasons other than disability." (*Id.*) He indicated that under the above hypothetical, Kliment could "fulfill all aspects of that job, really. It is an unskilled job. The issue seems to be the hygiene issue, and it's out of my areas of expertise to determine whether that's a disability or something that's unavoidable by him." (*Id.*)

The VE further indicated that in general, a restaurant's employment of someone with Kliment's hygiene problem "would probably be a special condition," but only if poor hygiene is designated as a disability. (R. 377) In light of the fact that Kliment worked at Mike's Saloon for several years and was not let go because of his hygiene problem, it would not be a special condition as Kliment performed the job (*id.*), but as the job is performed in the national economy, "[i]t would be a special condition in the sense that most employers would expect hygiene to be at a higher level than what he displays it. And . . . if the hygiene appears to be as his testimony and as in the record, then I think that employer would be hard pressed to keep him." (R. 378)

### 5. The ALJ's decision

The ALJ found Kliment had not performed work at the substantial gainful activity level since his alleged disability onset date of July 1, 2002. (R. 18) She found Kliment has the medically-determinable impairment of "mild mental retardation," but the impairment does not rise to the Listing level of severity. (R. 18-19) The ALJ reviewed Kliment's past work history and reported daily activities, and concluded Kliment has the residual functional capacity for maximum sustained work activity. She concluded Kliment could return to his past relevant work as a kitchen helper and dishwasher, and he therefore is not disabled. (R. 19-22)

The ALJ found that "[n]otwithstanding Dr. Fiferman's diagnosis of a moderate recurrent depressive disorder, her mental status examination, except for very poor hygiene and grooming, was fairly unremarkable. There simply was no evidence of anhedonia, appetitie [sic] or sleep disturbance, psychomotor agi[t]ation or retardation, decreased energy, emotionally rather than intellectually-based difficulties with concentration, suicidal ideation or psychosis." (R. 19-20) The ALJ noted Kliment "has never been treated for emotional concerns and the record does not contain any allegations of emotional problems." (R. 20)

The ALJ relied on the VE's testimony that based on the ALJ's hypothetical question, Kliment's "past relevant work as a kitchen helper and dishwasher did not require abilities beyond those set forth in the residual functional capacity assessment[.]" (R. 22) The ALJ found Kliment's testimony regarding his functional abilities to be credible, and to be "generally consistent" with the ALJ's assessment of Kliment's residual functional capacity. (R. 21)

Docket no. 12.

Upon review of the record, and absent any objections to Judge Zoss's factual findings, the court adopts all of Judge Zoss's factual findings.

## II. LEGAL STANDARDS

The court reviews the magistrate judge's report and recommendation pursuant to the statutory standards found in 28 U.S.C. § 636(b)(1):

A judge of the court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1) (2006); *see* Fed. R. Civ. P. 72(b) (stating identical requirements); N.D. IA. L.R. 72, 72.1 (allowing the referral of dispositive matters to a magistrate judge but not articulating any standards to review the magistrate judge's report and recommendation). While examining these statutory standards, the United States Supreme Court explained:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue *de novo* if no objections are filed, it does not preclude further review by the district judge, *sua sponte* or at the request of a party, under a *de novo* or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 154 (1985). Thus, a district court *may* review *de novo* any issue in a magistrate judge's report and recommendation at any time. *Id.* If a party files an objection to the magistrate judge's report and recommendation, however, the district court *must* "make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). In the absence of an objection, the district court is not required "to give any more consideration to the magistrate's report than the court considers appropriate." *Thomas*, 474 U.S. at 150.

   *De novo* review, of course, is nondeferential and generally allows a reviewing court to make an "independent review" of the entire matter. *Salve Regina College v. Russell*, 499 U.S. 225, 238 (1991) (noting also that "[w]hen *de novo* review is compelled, no form of appellate deference is acceptable"); *see Doe v. Chao*, 540 U.S. 614, 620-19 (2004) (noting *de novo* review is "distinct from any form of deferential review"). The *de novo* review of a magistrate judge's report and recommendation, however, only means a district court "'give[s] fresh consideration to those issues to which specific objection has been

made.'" *United States v. Raddatz*, 447 U.S. 667, 675 (1980) (quoting H.R. Rep. No. 94-1609, at 3, *reprinted in* 1976 U.S.C.C.A.N. 6162, 6163 (discussing how certain amendments affect 28 U.S.C. § 636(b))).   Thus, while *de novo* review generally entails review of an entire matter, in the context of § 636 a district court's *required de novo* review is limited to "*de novo* determination[s]" of only "those portions" or "specified proposed findings" to which objections have been made.   28 U.S.C. § 636(b)(1); *see Thomas*, 474 U.S. at 154 ("Any party that desires plenary consideration by the Article III judge of any *issue* need only ask." (emphasis added)).   Consequently, the Eighth Circuit Court of Appeals has indicated *de novo* review would only be required if objections were "specific enough to trigger *de novo* review." *Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir. 1989).   Despite this "specificity" requirement to trigger *de novo* review, the Eighth Circuit Court of Appeals has "emphasized the necessity . . . of retention by the district court of substantial control over the ultimate disposition of matters referred to a magistrate." *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994).   As a result, the Eighth Circuit has been willing to "liberally construe[]" otherwise general *pro se* objections to require a *de novo* review of all "alleged errors," *see Hudson v. Gammon*, 46 F.3d 785, 786 (8th Cir. 1995), and to conclude that general objections require "full *de novo* review" if the record is concise, *Belk*, 15 F.3d at 815 ("Therefore, even had petitioner's objections lacked specificity, a *de novo* review would still have been appropriate given such a concise record.").   Even if the reviewing court must construe objections liberally to require *de novo* review, it is clear to this court that there is a distinction between making an objection and making no objection at all.   *See Coop. Fin. Assoc., Inc. v. Garst*, 917 F. Supp. 1356, 1373 (N.D. Iowa 1996) ("The court finds that the distinction between a flawed effort to bring objections to the district court's attention and no effort to make such objections is appropriate.").   Therefore, this court will strive to provide *de novo* review of all issues

that might be addressed by any objection, whether general or specific, but will not feel compelled to give *de novo* review to matters to which no objection at all has been made.

In the absence of any objection, the Eighth Circuit Court of Appeals has indicated a district court should review a magistrate judge's report and recommendation under a clearly erroneous standard of review. *See Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting when no objections are filed and the time for filing objections has expired, "[the district court judge] would only have to review the findings of the magistrate judge for clear error"); *Taylor v. Farrier*, 910 F.2d 518, 520 (8th Cir. 1990) (noting the advisory committee's note to Fed. R. Civ. P. 72(b) indicates "when no timely objection is filed the court need only satisfy itself that there is no clear error on the face of the record"); *Branch*, 886 F.2d at 1046 (contrasting *de novo* review with "clearly erroneous standard" of review, and recognizing *de novo* review was required because objections were filed). The court is unaware of any case that has described the clearly erroneous standard of review in the context of a district court's review of a magistrate judge's report and recommendation to which no objection has been filed. In other contexts, however, the Supreme Court has stated the "foremost" principle under this standard of review "is that '[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). Thus, the clearly erroneous standard of review is deferential, *see Dixon v. Crete Medical Clinic, P.C.*, 498 F.3D 837, 847 (8th Cir. 2007) (noting a finding is not clearly erroneous even if another view is supported by the evidence), but a district court may still reject the magistrate judge's report and recommendation when the district court is "left with a

definite and firm conviction that a mistake has been committed," *U.S. Gypsum Co.*, 333 U.S. at 395.

Even though some "lesser review" than *de novo* is not "positively require[d]" by statute, *Thomas*, 474 U.S. at 150, Eighth Circuit precedent leads this court to believe that a clearly erroneous standard of review should generally be used as the baseline standard to review all findings in a magistrate judge's report and recommendation that are not objected to or when the parties fail to file any timely objections, *see Grinder*, 73 F.3d at 795; *Taylor*, 910 F.2d at 520; *Branch*, 886 F.2d at 1046; *see also* Fed. R. Civ. P. 72(b) advisory committee's note ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."). In the context of the review of a magistrate judge's report and recommendation, the court believes one further caveat is necessary: a district court always remains free to render its own decision under *de novo* review, regardless of whether it feels a mistake has been committed. *See Thomas*, 474 U.S. at 153-54. Thus, while a clearly erroneous standard of review is deferential and the minimum standard appropriate in this context, it is not mandatory, and the district court may choose to apply a less deferential standard.[4]

---

[4] The Eighth Circuit Court of Appeals, in the context of a dispositive matter originally referred to a magistrate judge, does not review a district court's decision in similar fashion. The Eighth Circuit Court of Appeals will either apply a clearly erroneous or plain error standard to review factual findings, depending on whether the appellant originally objected to the magistrate judge's report and recommendation. *See United States v. Brooks*, 285 F.3d 1102, 1105 (8th Cir. 2002) ("Ordinarily, we review a district court's factual findings for clear error . . . . Here, however, the record reflects that [the appellant] did not object to the magistrate's report and recommendation, and therefore we review the court's factual determinations for plain error." (citations omitted)); *United*

(continued...)

Kliment has objected to Judge Zoss's finding that there is not overwhelming evidence in the record that Kliment is disabled under Step 3, of the familiar five-step analysis found in 20 C.F.R. § 404.1520. *See Jones*, 335 F.3d at 699. Although the court will review the finding, *de novo*, and Judge Zoss's other findings for clear error, the court reviews the Commissioner's decision to determine whether the correct legal standards were applied and "whether the Commissioner's findings are supported by substantial evidence in the record as a whole." *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007) (citing

---

[4](...continued)
*States v. Looking*, 156 F.3d 803, 809 (8th Cir. 1998) ("[W]here the defendant fails to file timely objections to the magistrate judge's report and recommendation, the factual conclusions underlying that defendant's appeal are reviewed for plain error."). The plain error standard of review is different than a clearly erroneous standard of review, *see United States v. Barth*, 424 F.3d 752, 764 (8th Cir. 2005) (explaining the four elements of plain error review), and ultimately the plain error standard appears to be discretionary, as the failure to file objections technically waives the appellant's right to appeal factual findings, *see Griffini v. Mitchell*, 31 F.3d 690, 692 (8th Cir. 1994) (stating an appellant who did not object to the magistrate judge's report and recommendation waives his or her right to appeal factual findings, but then choosing to "review[] the magistrate judge's findings of fact for plain error"). An appellant does not waive his or her right to appeal questions of law or mixed questions of law and fact by failing to object to the magistrate judge's report and recommendation. *United States v. Benshop*, 138 F.3d 1229, 1234 (8th Cir. 1998) ("The rule in this circuit is that a failure to object to a magistrate judge's report and recommendation will *not* result in a waiver of the right to appeal '"when the questions involved are questions of law or mixed questions of law and fact."'" (quoting *Francis v. Bowen*, 804 F.2d 103, 104 (8th Cir. 1986), in turn quoting *Nash v. Black*, 781 F.2d 665, 667 (8th Cir. 1986))). In addition, legal conclusions will be reviewed *de novo*, regardless of whether an appellant objected to a magistrate judge's report and recommendation. *See, e.g.*, *United States v. Maxwell*, 498 F.3d 799, 801 n.2 (8th Cir. 2007) ("In cases like this one, 'where the defendant fails to file timely objections to the magistrate judge's report and recommendation, the factual conclusions underlying that defendant's appeal are reviewed for plain error.' We review the district court's legal conclusions *de novo*." (citation omitted)).

Haggard v. Apfel, 175 F.3d 591, 594 (8th Cir.1999), in turn citing *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir.1998). Under this deferential standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002); *see also Page*, 484 F.3d at 1042 ("Substantial evidence is relevant evidence which a reasonable mind would accept as adequate to support the Commissioner's conclusion.") (quoting *Haggard*, 175 F.3d at 594). Even if the court would have "'weighed the evidence differently,'" the Commissioner's decision will not be disturbed unless "it falls outside the available 'zone of choice.'" *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir. 2007) (quoting *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006)).

## III. LEGAL ANALYSIS

Judge Zoss recommended that this case be remanded for further proceedings, because the ALJ failed to properly consider whether Kliment met Listing 12.05(C)'s three requirements and because the ALJ failed to present a proper set of Kliment's limitations in her hypothetical to the VE. Although Judge Zoss found these two grounds for remand, he did not determine that there was overwhelming evidence that Kliment met all three of Listing 12.05(C)'s requirements and, therefore, did not recommend an immediate finding of disability. Kliment only objects to Judge Zoss's finding that there is not overwhelming evidence in the record to find that Kliment is disabled based on his meeting or equaling the three Listing 12.05(C) requirements. As a result, the court will review that finding *de novo* and Judge Zoss's remaining findings for clear error.

### A. Listing 12.05(C)

Kliment claims that he is disabled because he meets or equals the requirements contained in Listing of Impairment 12.05, which provides:

> Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
> . . .
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;
> . . . .

20 C.F.R. pt. 404, subpt. P, App. 1, § 12.05(C). "[T]o meet Listing 12.05C, a claimant must show: (1) a valid verbal, performance, or full scale IQ of 60 through 70; (2) an onset of the impairment before age 22; and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Maresh v. Barnhart*, 438 F.3d 897, 899 (8th Cir. 2006).

The court finds that the first two requirements of Listing 12.05(C) are met, as the record shows Kliment has a full scale IQ of 60 through 70, *see* R. at 300 (Dr. Leslie Fiferman's Report from her February 24, 2004, evaluation); R. at 305 (Dr. Baker's June 8, 2005, report); *see also* R. at 19 (the ALJ's recognition of these scores), and the onset of his mental retardation under Listing 12.05 before he reached 22 years of age. *See* R. at 307 (Dr. Mah-mood Syed's explanation that Kliment's 1983 evaluation qualified him as a student with a mental retardation). The Commissioner does not appear to seriously contest that these two requirements were met, in his brief. *See* docket no. 9. However,

the Commissioner does argue that Kliment has not demonstrated that he has an additional significant work-related limitation.

The third requirement under Listing 12.05(C) considers whether Kliment has "a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Maresh*, 438 F.3d at 899. The Code of Federal Regulations explains:

> For paragraph C, we will assess the degree of functional limitation the additional impairment(s) imposes to determine if it significantly limits your physical or mental ability to do basic work activities, i.e., is a "severe" impairment(s), as defined in §§ 404.1520(c)[5] and 416.920(c)[6]. If the additional

[5] Section 404.1520 concerning, "Evaluation of disability in general," section (c) states:

> You must have a severe impairment. If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience. However, it is possible for you to have a period of disability for a time in the past even though you do not now have a severe impairment.

20 C.F.R. § 404.1520(c).

[6] Section 416.920, which deals with the "Evaluation of disability of adults, in general," section c states:

> You must have a severe impairment. If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience.

(continued…)

impairment(s) does not cause limitations that are "severe" as defined in §§ 404.1520(c) and 416.920(c), we will not find that the additional impairment(s) imposes "an additional and significant work-related limitation of function," even if you are unable to do your past work because of the unique features of that work. Paragraph D contains the same functional criteria that are required under paragraph B of the other mental disorders listings.

20 C.F.R. pt. 404, subpt P, app. 1, § 12.00(A).

The Eighth Circuit Court of Appeals has, on several occasions, discussed the third requirement under § 12.05(C). The court has explained: "The third requirement of Listing 12.05C is that the claimant has a physical or other mental impairment imposing an additional and significant work-related limitation of function, i.e., a 'more than slight or minimal' effect on the ability to perform work." *Maresh*, 438 F.3d at 900 (quoting *Buckner v. Apfel*, 213 F.3d 1006, 1011 (8th Cir.2000), in turn quoting *Cook v. Bowen*, 797 F.2d 687, 690 (8th Cir.1986)); *see also Jones v. Barnhart*, 335 F.3d 697, 699 (8th Cir. 2003) ("A physical or other mental impairment is sufficient . . . when such impairment 'has a "more than slight or minimal" effect on [the claimant's] ability to perform work.'") (quoting *Buckner*, 213 F.3d at 1011, in turn quoting Cook, 979 F.2d at 690). The court also considers whether the "other mental impairment" is separate from the claimant's low I.Q.: "most of these asserted impairments are merely symptoms or manifestations of [the claimant's] mental retardation and thus cannot satisfy her obligation to show an additional impairment that meets the second part of section 12.05(C)." *Buckner*, 213 F.3d at 1012; *see also Jones*, 336 F.3d at 700-01 ("Notably, the Commissioner did not discuss [the claimant's] claimed speech and communications

---

[6](...continued)
20 C.F.R. § 416.920(c).

impairment as distinct from her low I.Q., and made no determination that it had no more than a 'slight or minimal' effect on her ability to work.").

In this case, Kliment argues that he has the following disorders that cause additional impairment:  1) Reading Disorder; 2) Mathematics Disorder; 3) Disorder of Written Expression; 4) Anxiety Disorder; and 5) Major Depression, recurrent.  *See* docket no. 8. Kliment also emphasizes his GAF scores have been 42 and 40.  The Commissioner, however, argues that the ALJ properly found that Kliment's only severe impairment was mild mental retardation.

Judge Zoss found, in his Report and Recommendation, that the Reading Disorder; Mathematics Disorder; and Disorder of Written Expression were well supported in the record.  In addition, Judge Zoss found that the ALJ had overlooked the diagnosis of Anxiety Disorder and the Global Assessment of Functioning scores in the 40s.  However, the record did not support a diagnosis of major depression, according to Judge Zoss. Upon a review of the record, the court finds that Judge Zoss's findings are not clearly erroneous, as Dr. Fiferman's and Dr. Baker's opinions, and the record as a whole, support these findings.

Kliment  does not object to these findings but, instead, argues that Judge Zoss's findings provide overwhelming evidence that he has a significant work-related limitation of function.  Kliment claims that the Reading Disorder, Mathematics Disorder, and Disorder of Written Expression are an additional work-related limitation of function and that his low GAF scores establish that the disorders are sufficiently severe.

In considering Kliment's argument, the court will, briefly, discuss the significance of the GAF scores in relation to the disorders, as provided in the Diagnostic and Statistical

Manual of Mental Disorders-IV-TR (American Psychiatric Association, 2000) ("DSM-IV"). First, the court notes that the DSM-IV-TR 2000 cautions:

> Use of Clinical Judgment.
> DSM-IV is a classification of mental disorders that was developed for use in clinical, educational, and research settings. The diagnostic categories, criteria, and textual descriptions are meant to be employed by individuals with appropriate clinical training and experience in diagnosis. It is important that DSM-IV not be applied mechanically by untrained individuals. The specific diagnostic criteria included in DSM-IV are meant to serve as guidelines to be informed by clinical judgment and are not meant to be used in a cookbook fashion. For example, the exercise of clinical judgment may justify giving a certain diagnosis to an individual even though the clinical presentation falls just short of meeting the full criteria for the diagnosis as long as the symptoms that are present are persistent and severe.

American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 701-706 (4th ed. text rev. 2000) ("DSM-IV-TR") at xxxii. Here, the court does not attempt to apply the DSM-IV criteria for the purposes of diagnosis. Rather, the court believes a brief overview of the DSM-IV's organization and general approach is instructive.

DSM-IV provides for a multiaxial assessment. A multiaxial system "involves an assessment on several axes, each of which refers to a different domain of information that may help the clinician plan treatment and predict outcome." DSM-IV-TR at 27. The five axes are: Axis I, Clinical Disorders; Axis II, Personality Disorders, Mental Retardation; Axis III, General Medical Conditions; Axis IV, Psychosocial and Environmental Problems; and Axis V, Global Assessment of Functioning. *See id.* The multiaxial system:

> facilitates comprehensive and systematic evaluation with attention to the various mental disorders and general medical

> conditions, psychosocial and environmental problems, and
> level of functioning that might be overlooked if the focus were
> on assessing a single presenting problem. A multiaxial system
> provides a convenient format for organizing and
> communicating clinical information, for capturing the
> complexity of clinical situations, and for describing the
> heterogeneity of individuals presenting with the same
> diagnosis.

*Id.* While Axis I-IV help identify disorders, conditions, and psychosocial and environmental problems, Axis V, where the Global Assessment of Functioning ("GAF") is scored, "is for reporting the clinician's judgment of the individual's overall level of functioning." *Id.* at 32. "The GAF Scale may be particularly useful in tracking the clinical progress of individuals in global terms, using a single measure." *Id.*

Because the multiaxial system assigns a GAF score based on an individual's overall level of functioning, it does not measure the severity of one particular disorder assigned in a different Axis. Thus, the court finds no basis for Kliment's argument that his GAF scores describe the severity of his Axis I disorders. This distinction is important because of the Eighth Circuit Court of Appeals's requirement that the claimant's mental retardation be distinct from the other additional and significant limitations. *See Buckner*, 213 F.3d at 1012 ("most of these asserted impairments are merely symptoms or manifestations of [the claimant's] mental retardation and thus cannot satisfy her obligation to show an additional impairment that meets the second part [(the third requirement)] of section 12.05(C)."). Although Kliment's GAF scores are certainly relevant to whether he is disabled, they are not determinative when specifically considering whether Kliment meets the third requirement in Listing 12.05(C)—the GAF score considers Kliment's mild mental retardation, or low I.Q., and other "psychological, social, and occupational functioning,"

DSM-IV-TR at 32, without specifying what, if any, part of the score is attributable to the other alleged impairments.

A closer look at the disorders Kliment identifies, however, does provide evidence that they are distinct from his IQ and mild mental retardation. DSM-IV explains the diagnostic features of 315.00 Reading Disorder:

> The essential feature of Reading Disorder is reading achievement (i.e., reading accuracy, speed, or comprehension as measured by individually administered standardized tests) that falls *substantially below that expected given the individual's* chronological age, *measured intelligence*, and age-appropriate education (Criterion A). The disturbance in reading significantly interferes with academic achievement or with activities of daily living that require reading skills (Criterion B). If a sensory deficit is present, the reading difficulties are in excess of those usually associated with it (Criterion C). If a neurological or other general medical condition or sensory deficit is present, it should be coded on Axis III.

*Id.* at 51 (emphasis added). Because evaluation of Reading Disorder considers what is expected for the individual, considering his "measured intelligence," there is support for the proposition that Kliment's diagnosis of Reading Disorder is separate from his mild mental retardation or low IQ. The same is true for 315.1 Mathematics Disorder and 315.2 Disorder of Written Expression, because the disorders similarly take into account what is expected based on the individual's "measured intelligence." *See id.* at 53-55. Even though the Reading Disorder, Mathematics Disorder, and Disorder of Written Expression may be conceptually distinct from Kliment's mild mental retardation, or low IQ, these disorders—or the 300.00 Anxiety Disorder—must, nevertheless, impose "an additional and significant work-related limitation of function, i.e., a 'more than slight or minimal' effect

on the ability to perform work." *Maresh*, 438 F.3d at 900 (quoting *Buckner*, 213 F.3d at 1011, in turn quoting *Cook*, 797 F.2d at 690).

The Eighth Circuit Court of Appeals has provided some guidance concerning this standard. In *Maresh*, the court explained that the claimant's performance of gainful activity was not determinative of whether he met the 12.05(C) requirements—although the claimant's impairment did not prevent him from working, he often missed work. The court also stated that: "[t]he issue is not whether the claimant can perform gainful activity; rather, it is whether he has a[n] . . . impairment, other than his conceded mental impairment, which provides significant work-related limited function. . . ." *Maresh*, 438 F.3d at 901. The court has also explained that the impairment does not need to be independently disabling. The court also stated, in *Sird v. Chater*: "If the plaintiff's . . . impairment were required to be independently disabling, section 12.05(c) would be rendered meaningless. Therefore, something less than a preclusion from any substantial gainful employment must apply." *Sird v. Chater*, 105 F.3d 401, 403 (8th Cir. 1997) (quoting *Branham v. Heckler*, 775 F.2d 1271, 1273 (4th Cir. 1985)). In response to attempts to distinguish impairments, even of the same type, the Eighth Circuit Court of Appeals returns to its standard of whether the impairment provides only a "slight or minimal" effect on the ability to work:

> The Commissioner argues that Ms. Jones's speech impairment is not so severe as that of the claimant in *Bailey v. Apfel*, 230 F.3d 1063 (8th Cir. 2000), a similar case cited and distinguished by the District Court. This may well be true. The question before us, however, is not simply whether Ms. Jones's speech difficulties are as severe as Bailey's were. The question, instead, is whether substantial evidence on the record as a whole can support a finding that Ms. Jones's difficulties are "slight or minimal."

*Jones v. Barnhart*, 335 F.3d 697, 701 (8th Cir. 2003).

The Eighth Circuit Court of Appeals has explained:

> Ordinarily, when a claimant appeals from the Commissioner's denial of benefits and we find that such a denial was improper, we, out of "our abundant deference to the ALJ," remand the case for further administrative proceedings. *Cox v. Apfel*, 160 F.3d 1203, 1210 (8th Cir.1998). Consistent with this rule, we may enter an immediate finding of disability only if the record "overwhelmingly supports" such a finding. *Thompson v. Sullivan*, 957 F.2d 611, 614 (8th Cir.1992); *see Fowler v. Bowen*, 866 F.2d 249, 253 (8th Cir.1989); *Talbott v. Bowen*, 821 F.2d 511, 514 (8th Cir.1987).

*Buckner v. Apfel*, 213 F.3d 1006, 1011 (8th Cir. 2000). Although the court finds that there is not substantial evidence in the record as a whole to support the ALJ's finding that mild mental retardation is the only disorder impacting Kliment's ability to work, the record does not overwhelmingly support a finding that Listing 12.05(C)'s third requirement is fulfilled. Listing 12.05(C)'s third requirement demands, "that the claimant has a physical or other mental impairment imposing an additional and significant work-related limitation of function, i.e., a 'more than slight or minimal' effect on the ability to perform work." *Maresh*, 438 F.3d at 900 (citations omitted). While the record provides evidence that Kliment has other disorders that could cause such an impairment, the record does not overwhelmingly support the proposition that they are distinct from Kliment's mild mental retardation. Kliment's low GAF scores do not provide overwhelming evidence because they refer to his overall level of functioning. Upon reviewing, *de novo*, whether there is overwhelming evidence to support a finding that Kliment fulfills the requirements of Listing 12.05(C), *see Buckner*, 213 F.3d at 1011, the court finds that there is not such overwhelming evidence in the record. However, having found that there is not substantial evidence in the record to support the ALJ's finding that mild mental retardation is the only

severe impairment that Kliment suffers from—and having found that there is not substantial evidence in the record to support the ALJ's finding that Kliment does not meet the requirements of Listing 12.05(C)—the court will remand this case for further proceedings.

## B. Vocational Expert's Hypothetical

Judge Zoss also found that the VE's testimony does not constitute substantial evidence in the record to support the ALJ's finding that Kliment is able to return to his past relevant work. "In fashioning an appropriate hypothetical question for a vocational expert, the ALJ is required to include all the claimant's impairments supported by substantial evidence in the record as a whole." *Finch v. Astrue*, 547 F.3d 933, 937 (8th Cir. 2008) (quoting *Swope v. Barnhart*, 436 F.3d 1023, 1025 (8th Cir.2006), in turn citing *Grissom v. Barnhart*, 416 F.3d 834, 837 (8th Cir.2005)). Judge Zoss explained that the ALJ's hypothetical question to the VE failed to consider Kliment's relevant impairments, misstated his age as 38 rather than 42, failed to include his GAF or full scale IQ scores, and labeled his mild mental retardation as "borderline intellectual functioning." *See* docket no. 12. For the same reasons as articulated by Judge Zoss, the court finds that there is not substantial evidence in the record to support the ALJ's finding that Kliment can return to past work and that Judge Zoss's finding in this regard was not clearly erroneous. The court, having required remand at Step 3, will also remand the case for further consideration of Kliment's residual functional capacity.

## IV. DIRECTIONS ON REMAND

The court has found that the ALJ improperly failed to consider Kliment's diagnosed 315.00 Reading Disorder, 315.1 Mathematics Disorder, 315.2 Disorder of Written Expression, and 300.00 Anxiety Disorder, when considering whether he met the

requirements of Listing 12.05(C). On remand, the ALJ shall further develop the record in accordance with the above discussion of Listing 12.05(C)'s third requirement. The ALJ shall specifically consider whether the disorders amount to an "impairment imposing an additional and significant work-related limitation of function, i.e., a 'more than slight or minimal' effect on the ability to perform work." *Maresh*, 438 F.3d at 900 (citations omitted). Even if the ALJ finds that Kliment's condition has not worsened since he last worked, the finding that he has such an impairment would require a determination that Kliment is disabled. *See Maresh,* 438 F.3d at 901 ("The issue is not whether the claimant can perform gainful activity; rather, it is whether he has a[n] . . . impairment, other than his conceded mental impairment, which provides significant work-related limited function. . . ." ). As Judge Zoss noted, the ALJ gave little weight to the opinions of the two psychologists who examined Kliment, but instead relied on the testimony of non-examining source Dr. England—the ALJ should reevaluate the weight to be given to these medical opinions and give her reasons for the evaluation.

The ALJ shall also present a hypothetical to a VE that encompasses all of Kliment's impairments. *See Finch*, 547 F.3d at 937. The court also notes that, although the ALJ cited *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), she may have—at least in part—abdicated her role in making credibility determinations when providing a hypothetical that left some of these determinations to the VE. *See* R. at 375 (The ALJ's hypothetical included: "This is an individual who testified he can't read or write. However, he testified he read the driver's test once and passed. He also testified that he learned of the job at Mike's Saloon by reading the ad in the paper.")

### V. CONCLUSION

THEREFORE, the court finds that the ALJ's determination that Kliment is not disabled is not supported by substantial evidence in the record as a whole. Judge Zoss recommended remanding the case for further proceedings. The court agrees that the case should be remanded and accepts Judge Zoss's Report and Recommendation (docket no. 12). The court reverses the Commissioner's decision that Kliment is not disabled and remands the case for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

**DATED** this 28th day of April, 2010.

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA